# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**JILL M. DENMAN**
**DAVID R. BISH**
Matheny Hahn Denman & Nix, LLP
Huntington, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KARL M. SCHARNBERG**
Deputy Attorney General
Indianapolis, Indiana



# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| MICHAEL CARPENTER, | ) |
| | ) |
| Appellant-Defendant, | ) |
| | ) |
| vs. | ) No. 85A05-1202-CR-57 |
| | ) |
| STATE OF INDIANA, | ) |
| | ) |
| Appellee-Plaintiff. | ) |

APPEAL FROM THE WABASH CIRCUIT COURT
The Honorable Robert R. McCallen, III, Judge
Cause No. 85C01-1102-FB-142

**September 19, 2012**

**OPINION - FOR PUBLICATION**

**BARNES, Judge**

**Case Summary**

Michael Carpenter appeals his conviction for Class B felony conspiracy to commit dealing in methamphetamine. We affirm.

**Issue**

Carpenter raises one issue, which we restate as whether the trial court properly admitted evidence found when officers attempted to serve an arrest warrant at the residence where he was living.

**Facts**

In February 2011, Carpenter was living with Frank and Emily Price at 11458 North 525 West in North Manchester. They had moved into the residence in October 2010. On the afternoon of February 20, 2011, David Small and Michael Crum called Frank regarding the purchase of prescription drugs. Frank responded that he did not have prescription drugs but that he had some methamphetamine. Small and Crum visited Frank, purchased some methamphetamine, and smoked it. Frank offered to make more methamphetamine if Small and Crum purchased some pseudoephedrine. After Small and Crum made the pseudoephedrine purchases, they gave the pills to Frank. Emily contacted them later in the evening and said to "come over." Tr. p. 160. Frank, Emily, and Carpenter were at the residence when Small and Crum arrived. Carpenter had removed the lithium from some batteries for use in manufacturing the methamphetamine. Frank was making the methamphetamine in an upstairs bedroom, but they later moved it to a downstairs bathroom.

At the same time, deputies from the Wabash County Sheriff's Department were attempting to serve several arrest warrants, including an arrest warrant for Austin Howard. The arrest warrant for Howard was issued on January 4, 2011, and listed his last known address as 525 West State Road 15, North Manchester, which is actually an intersection. Deputy Ben Duecker was unfamiliar with the area and asked Officer Jeremy Jones of the North Manchester Police Department to assist with the address. Officer Jones said that Howard lived at 11458 North 525 West, which is near the intersection listed on the arrest warrant. Howard had, in fact, lived at the residence with his parents a couple of years before the Prices moved into the residence.

Three officers arrived at the residence at approximately 12:30 a.m., and there were vehicles in the driveway and lights on in the house. Deputy Duecker approached the rear door, which appeared to be the main entrance to the residence, and knocked. Reserve Deputy Matthew Cox and Reserve Deputy Kerry Babbitt walked toward the front door of the house to set up a perimeter to prevent Howard from escaping. As he was waiting, Deputy Cox saw something come out of a window on the side of the house and initially thought someone was attempting to flee. Deputy Cox approached the window and saw that it was a bathroom. He saw several people in the bathroom, saw all of them except one male leave the bathroom, and saw the remaining person, later identified as Carpenter, putting substances into the toilet. Deputy Cox knocked loudly on the window, accidentally breaking the window, identified himself as a police officer, and told Carpenter to stop. Carpenter continued placing the substance into the toilet, put his hands above his head, and walked out of the bathroom.

3

Deputy Cox notified Deputy Duecker about the incident, and both officers approached the bathroom window again. They saw what they believed were items used to manufacture methamphetamine. The officers then obtained a search warrant for the residence. When the officers entered the residence several hours later, they soon found Carpenter and Crum. They later found Small and the Prices hiding in the attic.

The State charged Carpenter with Class B felony conspiracy to commit dealing in methamphetamine and Class D felony maintaining a common nuisance. At the start of the jury trial, Carpenter asked the trial court to take judicial notice of a motion to suppress and transcript of a suppression hearing held in the action against Frank, in which Frank argued the initial search as a result of the arrest warrant was invalid under the United States Constitution. Carpenter also argued that the initial search violated the Indiana Constitution. The State asked that the trial court's denial of Frank's motion to suppress also be incorporated. The trial court noted that Carpenter was raising the argument and "rule[d] the same and preserve[d] that issue for . . . appeal if necessary." Tr. p. 127. Carpenter later made some continuing objections to the initial search. The jury found Carpenter guilty of Class B felony conspiracy to commit dealing in methamphetamine but not guilty of maintaining a common nuisance. Carpenter now appeals.

**Analysis**

Carpenter argues that evidence admitted at trial was obtained in violation of the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. Carpenter first argues that the police did not have a legitimate

4

reason for being on the property because Howard had not lived at the property for a couple of years and the officers did not have reason to believe that Howard was at the property. Carpenter also argues that Deputy Cox's initial entry into the side yard, looking into the window, and returning to the window with Deputy Duecker were unlawful.

## I. Fourth Amendment

The Fourth Amendment to the United States Constitution proclaims that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "This federal right to be free of unreasonable searches and seizures applies to the states through the Fourteenth Amendment." Duran v. State, 930 N.E.2d 10, 14 (Ind. 2010). "In recognition of this principle, the police may not enter a home by force to make a 'routine' arrest without a warrant." Id. at 14-15 (quoting Payton v. New York, 445 U.S. 573, 576, 100 S. Ct. 1371, 1375 (1980)). "An arrest warrant founded on probable cause gives the police 'limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.'" Id. at 15 (quoting Payton, 445 U.S. at 603, 100 S. Ct. at 1388). Thus, "[m]ost jurisdictions require that the police have a reasonable belief that the dwelling is the residence of the subject of the warrant and that the subject is present at the time the officers attempt to enter on authority of an arrest warrant." Id. at 16. "The belief is judged on the information available to the officers at the time of entry and need not prove to have been correct in hindsight." Id. at 15 (citing United States v. Lovelock, 170 F.3d 339, 343 (2d Cir. 1999), cert. denied). "As one leading treatise summarized, it is 'generally accepted' that reason to believe 'involves something less

5

than' probable cause."[1]  Id. (quoting 3 Wayne R. LaFave, Search and Seizure § 6.1(a), at 265 (4th ed. 2004)).

Carpenter argues that the officers did not have reason to believe that the house was Howard's residence or that Howard was present when they attempted to serve the arrest warrant.[2]  An arrest warrant is not required to specify the address of the person to be arrested.  See Ind. Code § 35-33-2-2.  However, the arrest warrant for Howard, which was issued on January 4, 2011, listed his last known address as 525 West State Road 15, North Manchester.  Because this address was actually an intersection and Deputy Duecker was unfamiliar with the area, he asked Officer Jones of the North Manchester Police Department to assist with the address.  Officer Jones told Deputy Duecker that Howard lived at 11458 North 525 West, which is a residence near the intersection listed on the arrest warrant.  The officers arrived at the residence at approximately 12:30 a.m., and there were vehicles in the driveway and lights on in the house.

We conclude that the information known to the officers was sufficient to give the officers a reasonable belief that the house was Howard's residence and that Howard was present at the time.  The arrest warrant listed an approximate last known address for Howard and that information was confirmed by another officer.  Further, given the late

---

[1] In Duran, our supreme court noted that courts have reached differing conclusions on whether "reason to believe" was equivalent to reasonable suspicion or probable cause.  Duran, 930 N.E.2d at 16.  It was unnecessary for the court to reach a decision on the definition of "reason to believe" because the officers in Duran "did not satisfy even the least restrictive reasonable suspicion standard."  Id.  Carpenter argues that the officers did not have reasonable suspicion that Howard lived at the residence or was present at the time, and Carpenter does not argue that probable cause was required.  Thus, we will address whether the officers had reasonable suspicion.

[2] Carpenter makes no argument that the arrest warrant itself was invalid.

hour, the vehicles in the driveway, and the lights on at the residence, the officers had reason to believe that Howard would be home. See, e.g., United States v. Thomas, 429 F.3d 282, 286 (D.C. Cir. 2005) (holding that "the early morning hour was reason enough" for the officers to believe that the defendant would be at home when they executed the warrant), cert. denied; United States v. Bervaldi, 226 F.3d 1256, 1267 (11th Cir. 2000) ("It was reasonable to believe, in the absence of contrary evidence, that [the subject of the arrest warrant] would be at his residence at 6:00 in the morning."). The fact that the officers' beliefs were ultimately incorrect is merely hindsight and does not affect whether they had reason to believe that the house was Howard's residence and that Howard was present at the time of serving the warrant.

Having concluded that the officers properly approached the residence to serve the arrest warrant, we now address Carpenter's argument that the officers improperly entered the curtilage of the house by accessing areas not intended for use by the public. In general, "[t]he land immediately surrounding and associated with a home, the curtilage, also merits the Fourth Amendment protections that attach to the home." Holder v. State, 847 N.E.2d 930, 936 (Ind. 2006) (citing Oliver v. United States, 466 U.S. 170, 180, 104 S. Ct. 1735, 1742 (1984)). However, the cases cited by Carpenter are inapplicable because they concern entry onto property without a warrant.

Given the arrest warrant, the officers had "limited authority" to enter the residence. Duran, 930 N.E.2d at 15. Clearly, if the officers had authority to actually enter the residence, they also had authority to walk around the curtilage. Once properly on the curtilage, the officers could notice things in plain view, such as through the

7

partially uncovered window. See, e.g., Hardister v. State, 849 N.E.2d 563, 572 (Ind. 2006) (holding that once the officers, who were chasing suspects, "were lawfully present in the backyard, their looking into the kitchen through the side and rear windows, was also reasonable as an effort to locate the fleeing suspects"); McCloud v. Com., 279 S.W.3d 162, 166 (Ky. Ct. App. 2007) (holding that "a valid arrest warrant also authorizes the police to enter that part of the curtilage of a private residence necessary to secure the rear door of the residence"), cert. denied; State v. Northover, 991 P.2d 380, 384 (Idaho Ct. App. 1999) (holding that, if a police officer may enter a suspect's house to execute an arrest warrant when the officer has reason to believe the suspect is inside, the officer may also peer through windows located on the property); Carter v. State, 708 S.E.2d 595, 598 (Ga. Ct. App. 2011) (holding that officers had authority to enter the back yard of a home and look into the open door of the shed during service of an arrest warrant), cert. denied. We conclude that the officers did not violate Carpenter's Fourth Amendment rights when they entered the house's curtilage pursuant to an arrest warrant and looked into the bathroom window.

## II. Indiana Constitution

Carpenter also argues that the officers violated his rights under Article 1, Section 11, of the Indiana Constitution, which provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

8

"Although this language tracks the Fourth Amendment verbatim, we proceed somewhat differently when analyzing the language under the Indiana Constitution than when considering the same language under the Federal Constitution." Trimble v. State, 842 N.E.2d 798, 803 (Ind. 2006), adhered to on rehearing by 848 N.E.2d 278 (Ind. 2006). "Instead of focusing on the defendant's reasonable expectation of privacy, we focus on the actions of the police officer, concluding that the search is legitimate where it is reasonable given the totality of the circumstances." Id. "We will consider the following factors in assessing reasonableness: '1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs.'" Id. (quoting Litchfield v. State, 824 N.E.2d 356, 361 (Ind. 2005)).

Although Carpenter mentions Article I, Section 11, of the Indiana Constitution, he make no argument regarding the Litchfield factors used to evaluate the reasonableness of the officers' conduct. Accordingly, his state constitution argument is waived. See, e.g., Jackson v. State, 925 N.E.2d 369, 372 n.1 (Ind. 2010) ("Because Jackson does not provide any authority or argument supporting a separate standard under the Indiana Constitution, his state constitutional claim is waived.").

Waiver notwithstanding, we conclude that the officers did not violate Carpenter's rights under Article I, Section 11 of the Indiana Constitution. We begin by considering the degree of concern, suspicion, or knowledge that a violation has occurred. "In executing an arrest warrant, the Indiana Constitution, like the Fourth Amendment, focuses on the reasonable belief as to the residence and presence of the subject, not

9

whether a crime was committed." Duran, 930 N.E.2d at 18. "Similarly, the reasonableness of an entry into a home to execute an arrest warrant requires a reasonable belief that there is a valid warrant, a reasonable belief that the residence is that of the suspect, and a reasonable belief that the suspect will be found in the home." Id. We conclude that the officers, who were attempting to serve an arrest warrant on Howard, had reason to believe that Howard lived at the residence and was present.

The next factor is the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities. The degree of intrusion is evaluated from Carpenter's point of view. Id. Here, the officer approached the residence based on the arrest warrant for Howard and knocked on the back door, which appeared to be the residence's main entrance. Two other officers walked to the front of the house to make sure Howard did not escape through the front door. One of the officers approached the bathroom window after he noticed strange movements. He then saw Carpenter dumping items into the toilet and later saw items associated with the manufacture of methamphetamine. The officers then obtained a search warrant for the residence. We recognize that "[a]ll citizens have a very strong interest in protecting the sanctity of the home from unannounced midnight invasions." Id. at 19. However, this case is unlike the unlawful intrusion in Duran, which involved "a forced entry into Duran's apartment complete with drawn weapons and a shattered door." Id. Rather, it involved merely walking through the yard and looking into a partially uncovered window. We conclude that the degree of intrusion was minimal.

The final factor is the extent of law enforcement needs. "Executing an arrest warrant is of course an important function of law enforcement." Id. Although Carpenter argues that the officers improperly entered the curtilage, officers executing arrest warrants routinely cover all exits so that the subject of the arrest warrant does not escape through another exit. The extent of the law enforcement needs was moderate.

The officers here had reason to believe that Howard lived at the residence and was present, and thus, the degree of suspicion was moderate. The degree of intrusion into Carpenter's residence was minimal, and the extent of the law enforcement needs was moderate. We conclude that the officers' entry into the curtilage and looking into the bathroom window did not violate Article 1, Section 11 of the Indiana Constitution.

## Conclusion

The officers did not violate Carpenter's rights under the Fourth Amendment to the United States Constitution or Article 1, Section 11 of the Indiana Constitution. Thus, the trial court properly admitted the evidence found when the officers attempted to serve the arrest warrant. We affirm.

Affirmed.

VAIDIK, J., and MATHIAS, J., concur.